UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| RICHARD P. JAHN, JR., as CHAPTER 7 TRUSTEE for U.S. INSURANCE GROUP, LLC,<br><br>                Plaintiff,<br><br>                v.<br><br>FEDERAL DEPOSIT INSURANCE CORPORATION, as RECEIVER for THE PARK AVENUE BANK,<br><br>                Defendant. | Civil Action No. 10-1364 |

**MEMORANDUM OPINION**

This action pits the bankruptcy trustee for a defunct company, U.S. Insurance Group, LLC ("USIG"), against the Federal Deposit Insurance Corporation ("FDIC"), acting as receiver for a defunct bank, the Park Avenue Bank ("the Bank"). USIG, through its trustee, seeks to recover $6.5 million from the Bank based on theories of fraudulent transfer, civil conspiracy to deceive and defraud, and conversion. The FDIC has moved to dismiss the Complaint, arguing that it has a superior right to the funds at issue and that the plaintiff failed to exhaust administrative remedies for the conspiracy and conversion claims. For the reasons explained below, the FDIC's motion to dismiss is granted.

**I.     BACKGROUND**

On August 13, 2010, the plaintiff, Richard P. Jahn, Chapter 7 Trustee for USIG filed the Complaint in this action against the FDIC in its capacity as a receiver for The Park Avenue Bank. Compl. This action arises out of an alleged fraudulent scheme involving the Bank and its

1

President.  The details of this scheme appear undisputed and are important for understanding the legal arguments at issue between the parties here.

During the time period relevant to this case, Charles J. Antonucci was President, CEO, and Director of the Park Avenue Bank.  *Id.* ¶ 5.  Antonucci also owned a controlling interest in an entity called Bedford Consulting Group, LLC ("Bedford") and had close ties with a company called Oxygen Unlimited, LLC ("Oxygen").  *Id.* ¶¶ 5-6.

In the fall of 2008, USIG was experiencing serious financial difficulties and contacted Oxygen for "managerial and financial assistance."  *Id.* ¶ 6.  The plaintiff alleges that Oxygen proposed a scheme by which Oxygen would invest or loan $4.2 million to USIG and USIG would borrow an additional $800,000, totaling $5 million in new funding for USIG.  *Id.* ¶ 7.  Next, USIG would invest the $5 million in Bedford in exchange for a 40 percent interest in Bedford.  *Id*.  USIG would then obtain a $5 million loan from Park Avenue Bank, collateralized by the 40 percent interest in Bedford.  *Id*.

The plaintiff contends that on the basis of Oxygen's advice that it entered into a banking relationship with the Bank, which loaned $2.3 million to USIG to cover the $800,000 for the Bedford purchase and an additional $1.5 million for a one-year line of credit.  *Id.* ¶ 8.  Thus, overall, USIG would receive $6.5 million under the Oxygen proposal – $4.2 million in funding or loans via Oxygen and $2.3 million in loans directly from the Bank.  Oxygen's $4.2 million investment in USIG also consisted of funds obtained from the Bank in the form of loans to Oxygen.[1]  The plaintiff alleges, however, that the real purpose of Oxygen's proposal was to

---

[1] This fact is illustrated on a one-page chart of "The $6.5 Million Roundtrip Transaction" that the plaintiff attached to its proof of claim.  *See* Ex. 1 to the Declaration of Kathleen M. Balderston, dated December 22, 2010.  In evaluating the sufficiency of a complaint, the Court may consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the court may take judicial notice."  *St. Mark's Pl. Hous. Co., Inc.*, *v. U.S. Dep't of Hous. and Urban Dev.*, No. 08-193, 2009 WL 1543688, at *3 (D.D.C. Jun. 3, 2009).

"funnel loan proceeds to Antonnuci for the benefit of the Bank." *Id.* ¶ 7. As a result of Oxygen's representations to USIG, the plaintiff authorized Oxygen to "make deposits to, and withdrawals from USIG's account at the Bank" for the purpose of ensuring the future funding from the Bank for the purpose of purchasing interest in Bedford. *Id.* ¶ 9.

During the period of October 6 through November 10, 2008, the plaintiff alleges that USIG transferred the $6.5 million to Bedford. *Id.* ¶ 13. However, the plaintiff contends that USIG has never received any interest in Bedford, nor any value in exchange for the funds. *Id.*

Once the $6.5 million had been transferred from USIG to Bedford, Antonucci directed Bedford to transfer the $6.5 million to his personal bank account. *Id.* ¶ 15. Antonucci, in turn, then transferred the $6.5 million to the Bank as a purported investment in the Bank's capital. *Id.* In exchange for his purported capital investment, Antonucci acquired a majority stake in the Bank's holding company, Park Avenue Bancorp, Inc. *Id.* Thus, in what the parties have referred to as the "round trip transaction," Antonucci managed to purchase control of the Bank for himself using the Bank's own money, after funneling it through Oxygen, USIG, and Bedford.[2]

The plaintiff asserts that it did not have knowledge of Antonucci's manipulation of the funds, and that it did not authorize the misuse of its funds. *Id.* ¶ 16. Further, the plaintiff contends that the Bank retained the benefits of the transfers and ratified Antonucci's actions. *Id.* ¶ 17. Additionally, the plaintiff asserts that the Bank continued to charge USIG interest on the loan until the plaintiff filed for bankruptcy. *Id.*

On April 22, 2009, USIG filed a voluntary Chapter 11 bankruptcy petition in the Eastern District of Tennessee. *Id.* ¶¶ 2-3. The bankruptcy court converted the case to one under Chapter

---

[2] The FDIC notes in its submissions that, apart from defrauding the Bank itself and USIG, this scheme effectively defrauded the FDIC with respect to the adequacy of the Bank's capital, an important consideration for the FDIC's analysis of the Bank's health and its application for government assistance under the Troubled Asset Relief Program ("TARP"). *See* Reply to the Trustee's Mem. in Opp'n to the FDIC-Receiver's Mot. to Dismiss at 2.

3

7. *Id.* On March 12, 2010, the New York State Banking Department closed Park Avenue Bank and the FDIC was appointed as the Bank's receiver. Mem. in Supp. of the FDIC-Receiver's Mot. to Dismiss ("Def.'s Mem.") at 2.

On November 3, 2009, the plaintiff filed an adversary proceeding in the Eastern District of Tennessee bankruptcy court against Bedford to avoid the transfers made by Bedford and to recover the funds. Compl. ¶ 2; *In re U.S. Ins. Group, LLC*, 441 B.R. 294, 295 (Bankr. E.D. Tenn. 2010). The plaintiff filed an amended adversary complaint on May 28, 2010, adding Antonucci and the Bank, through its receiver the FDIC, as defendants. *In re U.S. Ins.* Group, LLC, 441 B.R. at 295. On September 9, 2010, the bankruptcy court dismissed the FDIC from the adversary proceeding due to lack of subject matter jurisdiction, concluding that as a post-receivership suit, the plaintiff's action was barred by 12 U.S.C. § 1821(d)(13)(D). *Id.* at 298. The bankruptcy court stated that the plaintiff, pursuant to statute, could pursue "its action against the FDIC as receiver for [the Bank] in the district court of the District of Columbia." *Id.* Accordingly, the plaintiff is pursuing its suit against the FDIC in this Court.[3]

The Complaint sets forth three counts against the FDIC as receiver for the Bank: (1) fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B), (2) civil conspiracy to deceive and defraud, and (3) conversion. Prior to filing this Complaint, the plaintiff filed a proof of claim against the Bank with the FDIC. Compl. ¶ 1. The FDIC denied the claim by letter dated June 17, 2010. *Id*.

In response to the plaintiff's Complaint, the FDIC has moved to dismiss this action under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). First, the FDIC argues that Count I for

---

[3] 12 U.S.C. §1821(d)(6)(A) makes judicial review of the FDIC's denial of an administrative claim available in either the district in which the depository institution's principal place of business is located or in the United States District Court for the District of Columbia. Accordingly, this district is an appropriate venue for this lawsuit.

fraudulent transfer should be dismissed for failure to state a claim for relief under Rule 12(b)(6) because a federal statute grants the FDIC a superior right to the funds in question. Def.'s Mem. at 8-9. Second, the FDIC argues that Counts II and III for civil conspiracy to defraud and conversion must also be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1). *Id.* at 5-8. Specifically, the FDIC argues that the civil conspiracy and conversion allegations set forth in the Complaint exceed the scope of the proof of claim filed by the plaintiff with the FDIC, which only asserted a claim for fraudulent transfer. *Id.* Thus, the FDIC contends that the plaintiff therefore failed to exhaust its administrative remedies for these claims.

The FDIC's motion to dismiss is presently before the Court. For the reasons explained below, the motion is granted.

## II. STANDARD OF REVIEW AND STATUTORY FRAMEWORK

### A. Motion to Dismiss Under Rule 12(b)(6)

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face" and to "nudge[ ] [his or her] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); Fed. R. Civ. P. 12(b)(6). Although detailed factual allegations are not required, the Complaint must set forth "more than an unadorned, the defendant-unlawfully-harmed-me accusation," *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009), and may not merely state "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. Instead, the complaint must plead facts that are more than "merely consistent with" a defendant's liability; "the plaintiff [must plead] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 129 S.Ct. at 1949 (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 556).

### B.      Motion to Dismiss Under Rule 12(b)(1)

A court must dismiss a case when it lacks subject matter jurisdiction. *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 62 (D.D.C. 2007). "Plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Am. Farm Bureau v. U.S. EPA*, 121 F. Supp. 2d 84, 90 (D.D.C. 2000); *accord Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  It is well established that, in deciding a motion to dismiss for lack of subject matter jurisdiction, a court must construe the allegations in the Complaint liberally but "need not accept factual inferences drawn by plaintiffs if those inferences are not supported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions." *Speelman v. United States*, 461 F. Supp. 2d 71, 73 (D.D.C. 2006); *see also Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987). The Court must be assured that it is acting within the scope of its jurisdictional authority and therefore must give the plaintiffs' factual allegations closer scrutiny when resolving a Rule 12(b)(1) motion than would be required for a Rule 12(b)(6) motion for failure to state a claim. *See Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Westberg v. FDIC*, 759 F. Supp. 2d 38, 41 (D.D.C. 2011); *Dubois v. Wash. Mut. Bank*, No. 09-2176, 2010 WL 3463368, at *2 (D.D.C. Sept. 2, 2010); *Hoffman v. District of Columbia*, 643 F. Supp. 2d 132, 135-136 (D.D.C. 2009); *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F.Supp.2d 9, 13-14 (D.D.C. 2001). In evaluating subject matter jurisdiction, the Court, when necessary, may look outside the Complaint to "undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts." *Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992) (citing *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)); *see also Alliance for Democracy v. FEC*, 362 F. Supp. 2d 138, 142 (D.D.C. 2005).

### C. Administrative Claims Process for FDIC Receiverships

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") bars judicial review of claims against the FDIC as a receiver unless a claimant first files an administrative claim with the FDIC pursuant to 12 U.S.C. § 1821(d)(5). *See* 12 U.S.C. §1821(d)(13)(D); *see also Freeman v. FDIC*, 56 F.3d 1394, 1399-1400 (D.C. Cir. 1995) (explaining that 12 U.S.C. § 1821(d) creates a jurisdictional bar that requires a claimant to exhaust administrative remedies before bringing a claim or action in court against the FDIC as receiver). If the FDIC disallows an administrative claim, the claimant may then seek district court review in either the district in which the depository institution's principal place of business is located or in the United States District Court for the District of Columbia. 12 U.S.C. § 1821(d)(6)(A).

## III. DISCUSSION

### A. The Motion To Dismiss Count I Is Granted.

In Count I of the Complaint, the plaintiff seeks to avoid the transfer by USIG of $6.5 million to Bedford, and to recover these funds from the FDIC for the benefit of the bankruptcy estate pursuant to 11 U.S.C. §§ 548(a)(1)(B) and 550(a) and (d). Compl. ¶¶ 18-23. The FDIC argues that the Complaint fails to state a viable claim for fraudulent transfer because FIRREA provides the FDIC, as receiver, with rights superior to those of the plaintiff, as trustee for USIG. Specifically, the FDIC argues that 12 U.S.C. § 1821(d)(17) provides the FDIC with superior rights to the plaintiff in cases of fraudulent transfer. This statute, which is at the heart of the parties' dispute here, provides, in pertinent part, as follows:

> (A) In general
>
> The [FDIC], as conservator or receiver for any insured depository institution, . . . may avoid a transfer of any interest of an institution-affiliated party, or any person **who the**

> **[FDIC] . . . determines is a debtor of the institution**, in property, or any obligation incurred by such party or person, that was **made within 5 years of the date on which the [FDIC] . . . was appointed conservator or receiver if such party or person voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured depository institution, the [FDIC] or other conservator, or any other appropriate Federal banking agency.**
>
> (B) Right of recovery
>
> To the extent a transfer is avoided under subparagraph (A), the [FDIC] . . . may recover, for the benefit of the insured depository institution, the property transferred, or, if a court so orders, the value of such property (at the time of such transfer) from--
>
> (i) the initial transferee of such transfer or the institution-affiliated party or person for whose benefit such transfer was made; or
>
> (ii) any immediate or mediate transferee of any such initial transferee.
>
> (C) Rights of transferee or obligee
>
> The [FDIC] . . . may not recover under subparagraph (B) from--
>
> (i) any transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith; or
>
> (ii) any immediate or mediate good faith transferee of such transferee.
>
> **(D) Rights under this paragraph**
>
> **The rights under this paragraph of the [FDIC] . . . shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11**.

12 U.S.C. § 1821(d)(17) (emphases added). The FDIC argues that if the allegations of Count I of the Complaint are accepted as true, as they must be in deciding a motion to dismiss, then they establish a fraudulent transfer that defrauded the Bank and the FDIC, and that, pursuant to Section 1821(d)(17), the FDIC as receiver has a superior right to the funds at issue. Def.'s Mem. at 9. While USIG may have been a victim of the same fraudulent scheme as the Bank and the FDIC, the FDIC's position is that its rights under FIRREA trump the plaintiff's right to recover the funds now held by the FDIC as receiver for the Bank.

8

The plaintiff counters that the FDIC has misconstrued its rights under the statute in at least three ways. First, the plaintiff argues that, under Subparagraphs (B) and (D), any superior right of the FDIC is "limited to property 'recovered' as a result of transfers 'avoided under Subsection (A)'" of Section § 1821(d)(17). Pl.'s Opp'n at 4. Here, the plaintiff points out that the FDIC has not initiated any actions to avoid any transfers or recover property. *Id.* at 4, 4 n.4. Second, the plaintiff argues that the FDIC has not pled – and the Complaint itself does not necessarily establish – certain elements required to trigger the FDIC's superior rights under Section 1821(d)(17). The plaintiff contends the FDIC has not established that USIG is properly considered a "person who the [FDIC] . . . determines is a debtor" of the Bank. 12 U.S.C. § 1821(d)(17)(A); Pl.'s Opp'n at 4. The plaintiff argues that the specific transfers that it seeks to avoid under Count I of the Complaint are "not the loans from the Bank to Oxygen or USIG, but the transfers of money from USIG to the Bank" via Bedford and Antonucci. *See* Pl.'s Opp'n at 5. With respect to these transfers, the plaintiff argues that USIG is not a debtor, but rather a creditor. *Id.* at 4-5 and n.5. In a related vein, the plaintiff argues that the FDIC also cannot establish that USIG made the relevant transfers "with the intent to hinder, delay, or defraud the insured depository institution [or] the [FDIC]," because USIG claims that it was an innocent victim of the fraud and thus had no fraudulent intent for the outgoing transfers it made. *See id.* at 4-5. Third, the plaintiff argues that, for the $2.3 million the Bank loaned directly to USIG (as opposed to the $4.2 million Oxygen investment), USIG was a transferee that took the funds for value in good faith, and that the safe harbor provision of Section 1821(d)(17)(C) explicitly negates the FDIC's superior rights to recovery against such good faith transferees. *See id.* at 5 (citing 12 U.S.C. § 1821(d)(17)(C)). The Court will address these arguments in turn.

9

The plaintiff's first argument concerns whether any superior rights of the FDIC under Section 1821(d)(17) are limited to property "recovered" as a result of transfers avoided under Subsection (A) of Section 1821(d)(17). The FDIC contends that Section 1821(d)(17) entails two distinct sets of rights – the right to avoid transfers, addressed in Subparagraph (A), and the right to recovery of property, addressed in Subparagraph (B). *See* Reply Mem. at 7. While the FDIC does not cite any case law for this proposition, a comparison with a bankruptcy trustee's powers to avoid transfers and recover property is instructive because Section 1821(d)(17) parallels the fraudulent transfer avoidance and recovery provisions of the Bankruptcy Code. *See* 5-548 *Collier on Bankruptcy* ¶ 548.01 ("The avoidance and recovery powers granted to the FDIC under [12 U.S.C. § 1821(d)(17)] mirror those of section 550 [of the Bankruptcy Code], permitting the FDIC not only to avoid the transaction, but to recover, with court permission, its money equivalent from the initial and later transferees.").[4] It is established in the bankruptcy context that the right to avoid transfers and the right to recovery are distinct. *See Southmark Corp. v. Schulte, Roth & Zabel, L.L.P.,* 242 B.R. 330, 337 (N.D. Tex. 1999) ("A trustee's ability to recover is independent from the ability to avoid the transfer."); *Collier on Bankruptcy* ¶ 550.01 ("Section 550 [of the Bankruptcy Code] thus 'enunciates the separation between the concepts of avoiding a transfer and recovering from the transferee.'") (quoting Analysis of H.R. 8200, H. Rep. No. 595, 95th Cong., 1st Sess. 375 (1977)).

"Avoidance is the setting aside or nullification of a transaction." *Id*. ¶ 548.10. "Nullification generally means that the transfer is retroactively ineffective and that the transferee legally acquired nothing as a result of the transfer." *Id.* "In short, [in the bankruptcy context],

---

[4] Indeed, the statutory language permitting avoidance of a transfer intended "to delay, hinder or defraud" creditors contained in both Section 548 of the Bankruptcy Code and 12 U.S.C. § 1821(d)(17)(A) derives from the first English codification of fraudulent transfer law in 1571. *Collier on Bankruptcy* ¶ 548.12 (citing 13 Eliz., ch. 5 (1571)).

the trustee may act as if the [fraudulent] transfer had not occurred. If the trustee avoids an obligation, nullification means that the transferee acquired no rights as a result of the transaction and that the trustee need not consider the obligation valid as against the estate." *Id.* "Once a transaction has been avoided [as fraudulent] under section 548 [of the Bankruptcy Code], the property that was transferred, or its value, can often be recovered from the recipient. This result is achieved through application of section 550(a) of the [Bankruptcy] Code," *id.*, whose language mirrors that of subparagraph (B) of Section 1821(d)(17). *Compare* 11 U.S.C. § 550(a) *and* 12 U.S.C. § 1821(d)(17)(B). With this understanding of the distinction between avoidance and recovery of a fraudulent transfer, the Court will now address the plaintiff's assertion that the FDIC's superior rights under Section 1821(d)(17) concern only the right to recovery. *See* Pl.'s Opp'n at 4.

Subparagraph (D) of the Section 1821(d)(17) states, in pertinent part, that "[t]he rights under this paragraph of the [FDIC] . . . shall be superior to any rights of a trustee or any other party (other than any party which is a Federal agency) under Title 11." 12 U.S.C. § 1821(d)(17)(D). Thus, by the language of the statute, the FDIC's superior rights extend to all rights "under this paragraph" – i.e., all rights under Section 1821(d)(17) – and not merely to the right of recovery set forth in Subparagraph (B). If Congress had intended to limit the FDIC's superior rights to the right of recovery alone, the statute presumably would have specified that "the rights under subparagraph (B)" shall be superior to those of a trustee. This conclusion is especially evident from the fact that Subparagraph (C), which limits the FDIC's right of recovery against good faith transferees, is phrased in precisely that manner. *See* 12 U.S.C. § 1821(d)(17)(C) ("The [FDIC] . . . may not recover under subparagraph (B) from . . . any transferee that takes for value . . . in good faith . . . ."). Accordingly, the Court rejects the

plaintiff's argument that any superior right of the FDIC is limited to property "recovered" as a result of transfers "avoided under Subsection (A)" of Section § 1821(d)(17). Rather, Section 1821(d)(17) provides the FDIC with the right to avoid transfers and the right to recover property and makes these rights superior to comparable rights of the bankruptcy trustee.[5]

The next question is whether the FDIC may rely on its rights under Section 1821(d)(17) as a shield to prevent the plaintiff from recovering the disputed funds without affirmatively initiating an action to "avoid" a transfer as fraudulent. Due to the particular structure of the fraud in this case, the funds fraudulently obtained from the Bank were ultimately re-deposited back into the Bank, purportedly as a new capital investment from Antonucci. Since the Bank already has the funds at issue, the FDIC therefore argues that it "does not need to proceed with a recovery action" in this case, but may nonetheless assert its superior rights to the funds pursuant Section 1821(d)(17). Reply Mem. at 7. In a more typical case, the FDIC would need to bring an action for both avoidance and recovery. *See, e.g.*, *FDIC v. Elio*, 39 F.3d 1239 (1st Cir. 1994); *FDIC v. Cafritz*, 762 F. Supp. 1503 (D.D.C. 1991). In this case, the FDIC contends that the allegations in the plaintiff's Complaint establish all of the statutory prerequisites for the FDIC's avoidance rights under Section 1821(d)(17), such that avoidance may be asserted as a defense entitling the FDIC to dismissal of the plaintiff's Complaint. The Court agrees that dismissal

---

[5] In *In re Colonial Realty Co.*, the Second Circuit held that Section 1821(d)(17) did not exempt the FDIC from the automatic stay imposed by 11 U.S.C. § 362 in seeking to pursue a fraudulent transfer action against a transferee of the bankruptcy debtor. 980 F.2d 125, 132-35 (2d Cir. 1992). The Second Circuit concluded that "a preferential claim . . . is at the heart of the FDIC's enhanced 'rights' under Section 1821(d)(17)" and noted that "[p]ertinent legislative history supports this view." *Id.* at 134 (citing H.R. Rep. No. 101-681(I), 101st Cong., 2d Sess. 181 (1990), reprinted in 1990 U.S.C.C.A.N. 6472, 6587) (stating that the language of § 1821(d)(17)(D) "gives the [FDIC] superior rights to the [bankruptcy] trustee . . . *with respect to the property transferred* ") (emphasis added by Second Circuit). *Colonial Realty* is not necessarily inconsistent with this Court's holding that where, as here, the FDIC as receiver already possesses the "property" and the facts entitling the FDIC to avoid the transfer are undisputed, the FDIC may obtain dismissal of a fraudulent transfer action brought against it by a bankruptcy trustee seeking to recover the property.
.

under Rule 12(b)(6) is available where the Complaint, on its face, establishes all of the elements of a defense. *See Farouki v. Petra Intern. Banking Corp.*, No. 08-2137, 2011 WL 4363785, at *15 (D.D.C. Sept. 20, 2011) (noting an "affirmative defense . . . may be raised via a Rule 12(b)(6) motion when the facts that give rise to the defense are clear from the face of the complaint.").[6] Accordingly, the Court must now evaluate whether the Complaint, on its face, alleges facts that entitle the FDIC to assert its superior rights of avoidance under Section 1821(d)(17).

To succeed on a fraudulent transfer claim under Section 1821(d)(17), "the F.D.I.C. must show that the transfer was made by the debtor of the financial institution within five years of the F.D.I.C.'s appointment as conservator or receiver, and that that debtor 'voluntarily or involuntarily made such transfer or incurred such liability with the intent to hinder, delay, or defraud the insured depository institution, the [FDIC] or other conservator, or any other appropriate Federal banking agency.'" *Elio*, 39 F.3d at 1245 (quoting 12 U.S.C. 1821(d)(17)(A)). The plaintiff contends that USIG is not a "debtor" with respect to the transfers it seeks to avoid under Count I – the transfers of money from USIG to Bedford, for which USIG contends it is a creditor. Pl.'s Opp'n at 4 n.5. Further, the plaintiff submits that even if it is deemed a "debtor," "there is no allegation in Count I of the Complaint that USIG transferred the funds at issue with intent to hinder, delay, or defraud the Bank." *Id.* at 4. These arguments are unavailing.

---

[6] In the bankruptcy context, the Bankruptcy Code provides explicitly that a trustee may raise avoidance of a fraudulent transfer as a defense to a claim. *See* 11 U.S.C. § 502(d) ("Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title."); *see also Collier on Bankruptcy* ¶ 546.02 ("[E]ven if a trustee is time-barred from commencing avoidance actions under section 546(a), it may raise avoidance actions as a defense to claims . . . .").

There is no requirement in the statute that USIG be a debtor with respect to any particular avoidable transfer. Rather, the FDIC may avoid an intentionally fraudulent transfer "of . . . any person who the [FDIC] . . . determines is a debtor of the institution. . . ." 12 U.S.C. § 1821(d)(17)(A). The plaintiff's allegations clearly establish that USIG is a debtor for the $2.3 million it borrowed from the Bank and that Oxygen is a debtor for the remaining $4.2 million that Oxygen borrowed from the Bank and provided to USIG.[7] *See* Ex. 1 to the Declaration of Kathleen M. Balderston, dated December 22, 2010. Further, while the plaintiff argues that USIG had no fraudulent intent for the specific transfers it made to Bedford, the Complaint leaves no doubt that the Oxygen proposal constituted a single, intentional, integrated fraudulent transfer scheme to benefit Antonucci. *See, e.g., id.* (describing the entire scheme as "The $6.5 Million Roundtrip Transaction"); Compl. ¶ 7 ("Oxygen's true purpose . . . was to funnel loan proceeds to Antonucci . . ."); *id.* ¶ 5 ("Both Bedford and the Bank are charged with knowledge of Antonucci's conduct and are vicariously liable for Antonucci's acts with regard to the transactions at issue."); *id.* ¶¶ 9-12 (alleging that agents of Oxygen had authority make deposits to and withdrawals in USIG's bank account and that Oxygen employees wired money to Bedford on USIG's behalf).[8] Thus, the transfers were made "with the intent to hinder, delay, or defraud the insured depository institution." Accordingly, the allegations of the Complaint satisfy the

---

[7] Additionally, the statute by its plain terms appears to give the FDIC the authority to determine who is a debtor. *See* 12 U.S.C. § 1821(d)(17)(A) ("The [FDIC] . . . may avoid a transfer of any interest of . . . any person who the [FDIC] . . . determines is a debtor of the institution. . . ." ). The FDIC has responded in its reply brief that it "has determined that both Oxygen and USIG, upon signing promissory notes with the Bank, became debtors of the Bank, and each and every transfer of funds in connection with the round trip transaction was intended to defraud the FDIC as to the amount of capital the Bank possessed." Reply Mem. at 7.

[8] "[W]hen a series of transactions actually comprise a single integrated transaction, notwithstanding the fact that the 'formal structure erected and labels attached' make them appear distinct," courts may collapse the transactions for the purposes of fraudulent transfer analysis. *See In re Old CarCo LLC*, 435 B.R. 169, 185 (Bankr. S.D.N.Y. 2010) (citing *In re Sunbeam Corp.*, 284 B.R. 355, 370 (Bankr. S.D.N.Y. 2002)); *see also id.* (finding formal application of the collapsing doctrine unnecessary because the transaction at issue was a single, integrated transaction).

necessary statutory elements to trigger the FDIC's ability to avoid the transfers to Bedford, among other fraudulent steps in the integrated fraudulent transaction.

The Court now must consider whether Subparagraph (C) negates the FDIC's claim to the money. Subparagraph (C) provides, in pertinent part, that the FDIC "may not recover under subparagraph (B) from . . . any transferee that takes for value . . . in good faith; or . . . any immediate or mediate good faith transferee of such transferee." 12 U.S.C. § 1821(d)(17)(C). The plaintiff argues that, at a minimum, the FDIC can have "no 'superior rights' with respect to recovery of the $2.3 million loaned by the Bank to USIG" because USIG accepted the loan proceeds for value, in the form of the promissory note, and in good faith. *See* Pl.'s Opp'n at 5; *see also* Compl. ¶ 30 ("The Bank, through its agent, Antonucci, has wrongfully transferred and acquired proceeds of loans acquired in good faith by USIG pursuant to the loan agreements."). The Complaint does not allege that USIG had any knowledge of the fraudulent scheme embodied in the Oxygen proposal.

The FDIC does not dispute the plaintiff's allegation that USIG took the $2.3 million loan for value as a good faith transferee. Rather, the FDIC, relying on the language of Subparagraph (C), argues that this fact is only relevant where the FDIC is attempting to exercise its right to recovery under Subparagraph (B) to recoup funds from that good faith transferee. *See* 12 U.S.C. § 1821(d)(17)(C) (stating that the FDIC "may not recover under subparagraph (B)" from any transferee that takes for value in good faith). Here, the FDIC contends that it is not attempting to "recover" anything from USIG under Subparagraph (B), since the FDIC already has the funds at issue. In light of the distinction between the concepts of avoidance and recovery discussed above and reflected in the statute, and given the express limitation of Subparagraph (C) to

15

situations in which the receiver is attempting to "recover under subparagraph (B)," the Court finds that the FDIC's position is correct.

This outcome is consistent with the purposes of Section 1821(d)(17), which, broadly speaking, gives the FDIC priority in recovering fraudulently transferred funds to which a bankruptcy trustee may have a competing claim. Accordingly, the motion to dismiss Count I is granted.[9]

### B. Counts II And III Are Dismissed For Lack of Subject Matter Jurisdiction

Both parties agree that this Court is without subject matter jurisdiction to hear the plaintiff's claims for civil conspiracy and conversion if the plaintiff did not exhaust administrative remedies for those claims by submitting an appropriate administrative claim to the FDIC. Pl.'s Opp'n at 6; *see also Freeman v. F.D.I.C.*, 56 F.3d 1394, 1399-1400 (D.C. Cir. 1995) (explaining that 12 U.S.C. § 1821(d) creates a jurisdictional bar that requires a claimant to exhaust administrative remedies before bringing a claim or action in court against the FDIC as receiver). It is also undisputed that the administrative proof of claim the plaintiff filed with the FDIC does not mention any claims for civil conspiracy or conversion, but rather refers only to a $6.5 million claim for fraudulent transfer under 11 U.S.C. §§ 548 and 550. *See* Proof of Claim, Exhibit 1 to the Declaration of Kathleen M. Balderston, dated December 22, 2010. Thus, the dispute between the parties centers on whether this proof of claim gave the FDIC sufficient notice of the conspiracy and conversion claims, despite not identifying those claims.

The plaintiff argues that the relevant inquiry for the Court is "whether the proof of claim provided the FDIC with such notice of the claim as to enable the FDIC to expeditiously and fairly evaluate it." Pl.'s Opp'n at 7. The FDIC responds that, even under this standard, the

---

[9] The plaintiff's submissions mention that USIG paid interest on its loans from the Bank, Pl.'s Opp'n at 5-6, but the Complaint does not request compensation for the interest paid to the Bank. *See* Compl. at 7-8. The Court therefore need not consider whether the plaintiff would be entitled to recover the interest payments.

plaintiff's conspiracy and conversion claims are barred because these are entirely new legal theories of recovery for which the proof of claim gave no notice at all.  Reply Mem. at 2-3.  The law supports the FDIC's position.

The plaintiff relies on two cases from outside this Circuit to support its argument: *Branch v. FDIC*, 833 F. Supp. 56 (D. Mass. 1993) and *Nants v. FDIC*, 864 F. Supp. 1211 (S.D. Fla. 1994).  In *Branch*, the plaintiff's complaint included seven new transactions that had not been listed in the plaintiff's original administrative proof of claim filing.  *Branch*, 833 F. Supp. at 59.  The *Branch* court allowed the plaintiff's complaint to stand, despite the addition of these transactions.  The new transactions in the *Branch* complaint, however, were consistent with the "broad pattern" of transfers detailed in the plaintiff's proofs of claim and, importantly, "in both his Complaints and Proofs of Claim, Branch assert[ed] the same legal theories of recovery. . . ." *Id.* at 61.  Thus, *Branch* is inapposite to the instant case, where the Complaint alleges two new legal theories of recovery.   The plaintiff's reliance on *Nants* is also misplaced.  In *Nants*, the court allowed the plaintiff to submit as evidence a letter that had not been attached to the plaintiff's original proof of claim.  *Nants*, 864 F. Supp. at 1218.  In distinguishing cases where courts had found a failure to exhaust administrative remedies, the *Nants* court observed that "[t]he jurisdictional bar found in those cases arose from the introduction of new legal claims, which had not been reflected in the complaints submitted to the FDIC with the proofs of claim." *Id.*  Thus, both *Branch* and *Nants* are consistent with the FDIC's view in this case.  Where, as here, a complaint alleges entirely new legal theories that are different than those reflected in the administrative proof of claim, the Court is without subject matter jurisdiction to consider the new causes of action.  *See Coleman v. FDIC,* 826 F. Supp. 31, 32 (D. Mass. 1993) ("This Court . . . has no jurisdiction over claims and theories of recovery in the Amended Complaint that were not

asserted in the original Complaint" because "no court may exercise jurisdiction over any claim against the FDIC as receiver unless the claimant has first submitted its claim to the FDIC administrative claim process."); *Brown Leasing Co. v. FDIC*, 833 F. Supp. 672, 675 (N.D. Ill. 1993) ("FDIC is entitled to fair notice of the facts and legal theories on which a claimant seeks relief from the failed institution."). The plaintiff's claims in Counts II and III of the Complaint are therefore dismissed for lack of subject matter jurisdiction.

## IV.   CONCLUSION

For the reasons discussed above, the FDIC's motion to dismiss is granted.[10]  An appropriate Order will accompany this Memorandum Opinion.


DATED: December 15, 2011                                    /s/ *Beryl A. Howell*
                                                                    BERYL A. HOWELL
                                                                    United States District Judge

---

[10] In accordance with Local Civil Rule 7(f), the request for oral argument in this case is denied.